Lehigh Zinc and Iron Co. *v.* Trotter.

---

THE LEHIGH ZINC AND IRON COMPANY (LIMITED), ap-pellants,

*v.*

CHARLES W. TROTTER, respondent.

Zinc ore was to be delivered upon the cars at Franklin, New Jersey, and was to be paid for at a price to be determined by the percentage of ZnO which it contained when delivered. The vendee was to make the necessary assay. The vendee transported the ore on open cars to Bethlehem, Pennsylvania, a

distance of sixty-two miles, and then endeavored to ascertain the amount of moisture which the ore contained. The results varied, from month to month, between 0.36 and 3.04 per centum.—*Held*, that these results were not safe indications of the amount of moisture in the ore when delivered at Franklin.

On appeal from a decree advised by Vice-Chancellor Bird, whose opinion is reported in *Trotter* v. *Heckscher, 15 Stew. Eq. 251.*

*Mr. C. D. Thompson* and *Mr. H. C. Pitney,* for appellants.

*Messrs. C. & R. W. Parker,* for respondent.

The opinion of the court was delivered by

DIXON, J.

This appeal presents a question as to the proper mode of assaying ore, under the contract between Charles W. Trotter and Charles A. Heckscher (who assigned his rights to the appellants), which is stated at length in *Trotter* v. *Heckscher, 13 Stew. Eq. 612, 645.*

In that case, it was decided by this court that the contract allowed to the appellants a reasonable discretion as to when and where the assay should be made, and that the making of the assay at Bethlehem, in the method theretofore used, was a proper exercise of that discretion.

In the assay then approved by us no account was taken of the moisture of the ore, nor was any suggestion made that it was at all important.

But in April, 1883, it occurred to the appellants that in handling, crushing, separating and pulverizing the ore, preparatory to getting a sample for analysis, the moisture contained in the ore when delivered was evaporated, so that while the pinch of dust taken by the chemist might correctly represent the average of all the other ingredients of the ore, it did not represent the moisture, and consequently, when the chemist reported that in a specified weight of the dust he had found a specified weight of ZnO, the percentage of ZnO thus indicated was not the true percentage of

Lehigh Zinc and Iron Co. v. Trotter.

ZnO in the ore, but was greater than the true percentage, according to the amount of moisture which the ore contained. Acting upon this idea, in December, 1884, the appellants took a separate sample of ore from each car, as it arrrived at Bethlehem, and weighed it, then dried it in bulk at a temperature of about 96° F., and again weighed it, thus discovering that the ore had lost, in drying, 3.04 per centum of its weight. Hence the inference was drawn that the weight of ZnO found by the chemist in the pulverized sample should be reduced in the same proportion, in order to give the true percentage of ZnO in the ore, and so the reported percentage of that month, December, 1884, which was 29.93, should become 29.02. Similar processes for the subsequent months gave somewhat similar results. Inasmuch as the price of the ore was fixed according to its richness in ZnO, increasing fifty cents per ton for each additional one per centum of ZnO above twenty-six per centum, the difference in percentage seemed important, and accordingly, early in 1885, the appellants presented to the chancellor, under the supervision of whose manager the ores were being delivered and the assays made, a petition asking that due allowances be awarded on account of this moisture. The chancellor denied the petition; and, we think, rightly.

According to the contract, the ore was to be delivered to the appellants on the cars at Franklin, New Jersey, and its price was to be fixed by its richness in ZnO when delivered. After receiving it at Franklin, the appellants transported it on open cars a distance of sixty-two miles to Bethlehem, Pennsylvania, before attempting to ascertain the amount of its moisture. It is evident that the amount of moisture in the ore at Bethlehem furnishes no safe indication of the amount at Franklin. It will vary with the constantly changing atmospheric conditions through which the ore has passed in transportation. This variation will indeed be confined to comparatively narrow limits, but it is because slight differences are important that the appellants filed their petition. When the appellants seek to substitute, for a method of anaysis adopted by themselves and approved by the other party to the contract, a new method not approved by the other party, and

ask the court to sanction the substitution on the ground that the new method is more accurate than the old, they should satisfy the court that their ground is well taken. But we are not satisfied that such is the fact. A supplemental petition, filed by the appellants on July 8th, 1886, states that their tests showed moisture in the ore varying from an average of 3.04 per centum of the whole weight in December, 1884, to an average of 0.36 per centum in August, 1885. Whether these differences were due to causes operating before the delivery at Franklin, or to those operating afterwards, there is no testimony to show, and conjecture may at least as easily fasten upon the latter as upon the former. Moreover, it is not clear that the sample, when weighed by the chemist for analysis, is free from moisture. The petition avers that it contains no appreciable moisture. But we understand that in the analysis, as at first conducted, no attention was paid to moisture, and it is not suggested that the method of analysis has been changed; hence, we are not informed that any (or, if any, what) effort was made to detect the moisture in the sample. It seems plain that unless it was weighed by the chemist in an atmosphere as drying as that through which the bulky sample used for estimating the moisture had passed, it would have absorbed more moisture proportionally than that bulky sample contained, and that the proportion would be greater than the mere difference in dryness of air would occasion, for the many particles of the pulverized sample would expose a relatively larger surface than the lumps of the bulky mass. Although the moisture thus adhering to the sample might be incapable of being separated and weighed by the chemist, yet still it might amount to some thousandths or even hundredths of the little pinch subjected to analysis, for we have already learned in this case that the assay of this ore is a very difficult process, and that elements which one chemist detects escape another equally skilled. Hence, our conclusion that there is nothing in the case, either of averment or of evidence, warranting the belief that injustice is done the appellants by refusing the allowance for which they pray, or any allowance based upon tests made in the manner above set forth.

The respondent, in answering the petitions filed, insists that the usage of those dealing in ores of this nature is so uniformly to disregard moisture that the agreement of these parties must be construed in compliance with it, and hence that any tests for moisture naturally in the ore are excluded in the contract.   We do not pass upon this claim, because it is not properly presented in the evidence, and the cause can be decided without it.

Let the order appealed from be affirmed.

*Order unanimously affirmed.*